ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| OSC Solutions, Inc. | )　ASBCA No. 63294 |
| | ) |
| Under Contract No. N00189-20-A-0002 | ) |

APPEARANCE FOR THE APPELLANT:　　　Frank V. Reilly, Esq.
　　　　　　　　　　　　　　　　　　　　Oakland Park, FL

APPEARANCES FOR THE GOVERNMENT:　Craig D. Jensen, Esq.
　　　　　　　　　　　　　　　　　　　　Navy Chief Trial Attorney
　　　　　　　　　　　　　　　　　　　Philip T. Rappmund, Esq.
　　　　　　　　　　　　　　　　　　　　Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE ARNETT

This appeal arises from denial of a claim filed by OSC Solutions, Inc. (OSC or appellant) seeking $1,152,858 for store labor services incurred in performance of a Blanket Purchase Agreement (BPA) with the U.S. Navy (Navy or government) (*see generally* R4, tab 6). OSC contends that it was not compensated for store labor service costs because only a "small percentage" of the orders estimated in the BPA were filled with OSC products and OSC's service costs were included within the cost of its products rather than priced separately (*id.* at 115). Thus, OSC only received payment for service costs associated with its products that were ordered which was insufficient to cover the service costs it incurred.

The Navy asserts that the BPA was not a contract as it did not obligate any funds or bind the government to order the estimated quantity of OSC products. The Navy notes that OSC was invited through the solicitation and during discussions to submit separate pricing for store labor services but responded that services were provided at "no additional charge" (gov't br. at 9-10).

We have previously determined that we have jurisdiction over this appeal pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109 (CDA). *See OSC Sol., Inc.*, ASBCA No. 63294, 23-1 BCA ¶ 38,266 at 185,805. Familiarity with the facts is presumed. The parties elected to submit this appeal on the record pursuant to Rule 11 and requested that the Board decide entitlement only.

Because the BPA is not a contract for purposes of the CDA, and OSC cannot prevail under express or implied-in-fact contract theories, the appeal is denied.

*The Solicitation:*

1.  On or about May 2, 2019, the Navy issued a solicitation for a BPA[1] to provide maintenance, repair, and operations (MRO) supplies and materials for sale in "shop stores" at four Naval Facility Public Works Department (PWD) locations in the Northeastern United States (R4, tab 7 at 565).

2.  The Performance Work Statement (PWS) required the contractor to "furnish all labor, supplies, equipment, management, supervision, and reports necessary to maintain an adequate supply of all parts, materials, and equipment needed to accomplish the needs of each PWD" (*id.* at 565). The contractor was required to fill "all customer requests for material" and "research and procure all items from vendors available from the approved GSA Schedules incorporated into" the BPA (*id.* at 572, 582). If the Navy needed material that was not stocked in the shop stores through the approved GSA Schedules, the PWS required the contractor to assist the Navy to find sources of supply (*id.* at 580).

3.  PWS § 2, Determination of Supply Requirements, indicated that the Navy could submit purchase requests for brand name or manufacturer-specific items. Unless otherwise stated in the purchase request, the contractor "may propose substitutes available on the Schedules" and the Navy could approve or reject the proposed substitution. (*Id.* at 568) Further, PWS § 2.1.4 stated, "MRO supplies and other product lines considered to be MRO items not initially identified in the Schedule provided **may be added at any time based on the requirements of the ordering activity and must be added to the GSA Schedule**" (*id.* at 568) (emphasis added). Regarding Ordering, PWS § 5.1 indicated, "The contractor is expected to research outside its own circle of suppliers to fulfill the Government's needs in an expeditious manner in accordance with their Contractor Teaming Arrangement" (*id.* at 572).

4.  The PWS identified a Shop Stores Inventory List and an Authorized Use List as attachments[2] (*id*. at 565, 582). During quarterly reviews, the Navy could modify the list as well as "present the contractor with a list" of shop store stock list items that were purchased through other sources. In that event, the contractor would be responsible to provide "documentation supporting why those items could not be purchased through the shop store." (*Id.* at 581)

---

[1] A blanket purchase agreement (BPA) is a "simplified method of filling anticipated repetitive needs for supplies or services by establishing 'charge accounts' with qualified sources of supply" (FAR 13.303-1).

[2] The attachments do not appear to be included in the record.

5. The solicitation stated,

> This BPA does not obligate any funds. Funds will be obligated by placement of calls under Federal Acquisition Regulation Subpart 8.4, entitled "Federal Supply Schedules", or the use of a Government wide purchase card issued under the Federal Acquisition Regulation 13.303 entitled "Blanket Purchase Agreements", and agency regulations.[3]

(*Id.* at 5). Further, it noted, "Orders will be placed against this BPA via Electronic Data Interchange (EDI), FAX, paper, or oral communications" (*id.* at 541). The solicitation stated, "Non-Schedule items will not be procured using the resulting Agreement" (*id.* at 551).

6. The solicitation provided the following instruction regarding discount rates in price proposals submitted by offerors:

> The offeror shall propose a fixed discount rate to be applied to the service and material requirements which will be established as a term in the resulting BPA. The offeror shall offer a fixed discount for each of the following:
>
> o Services;
> o Schedule 51V Materials; and
> o Each Schedule other than 51V used to complete the Test Market Basket.
>
> Note: All requirements to include services and materials must be on a FSS Schedule; no "open market" materials are permitted.

(*Id.* at 550) (emphasis omitted)[4]

---

[3] "The Federal Supply Schedule program is directed and managed by GSA and provides Federal agencies . . . with a simplified process for obtaining commercial supplies and commercial services at prices associated with volume buying" FAR 8.402(a).

[4] Schedule 51V Materials refers to GSA Schedule 51V Hardware Superstore. "Open market" refers to items that are not on Federal Supply Schedules. FAR 8.402(f).

7. The solicitation provided the following instruction regarding services pricing:

> Separate price information shall be submitted for each of the four (4) PWDs for a total of twelve (12) months of service support as required by the PWS. The price for the services shown in this spreadsheet shall include all fully-burdened labor required to provide services and shall be less than or equal to the offeror's GSA Schedule 51 V rates. The offeror shall apply the Services Discount proposed in Tab 1 of Attachment 3 to the total proposed services price, which will result in the Total Discounted Service Price . . . .

(*Id.* at 550)

*OSC's Proposal and Revisions*:

8. In response to the solicitation, OSC submitted a price proposal which stated, "10% Store service is included within the price of the products therefore there are no additional charge (sic) for services" (R4, tab 8 at 598). OSC's proposal also included a table to reflect the monthly and total service price for each of the four shop store locations. It stated a cost of $0 as the monthly and total service price for each location and included the following note under the table: "Store service is included within the price of the products therefore there are no additional charge (sic) for services." (*Id.* at 599)

9. On August 2, 2019, the Navy indicated that it would conduct exchanges and request final proposal revisions. It identified weaknesses in OSC's proposal, including noting that OSC's price proposal "must contain separately priced services." It requested that OSC address this concern. (R4, tab 9 at 605-06)

10. In response, OSC provided a seven-page letter dated August 2, 2019 and a subsequent email on August 8, 2019. Both communications from OSC stated:

> OSC is offering the required services to the Navy for no additional charge as they are incidental to the purchasing of the products from our GSA schedule contract. There is therefore no additional charge for OSC to offer the Navy the required services under the contract. Required services are included for no additional charge.

(R4, tabs 10 at 613, 11 at 615-16)

4

*The Agreement:*

11. On January 2, 2020, the Navy and OSC entered into BPA No. N0018920A0002. The BPA included a base ordering period through January 1, 2021, and four subsequent option years. (R4, tab 2 at 4, 39)

12. Paragraph (1) of the BPA stated, "The following contract services/products can be ordered under this BPA. All orders placed against this BPA are subject to the terms and conditions of the contract, except as noted below . . ." (*Id.* at 5) It noted, "Open market items may not be ordered under this BPA" (*id.*).[5]

13. Paragraph (3) of the BPA stated, "The Government estimates, but does not guarantee, that the volume of purchases through this agreement will be $70,070,404.09" (*id.*).

14. Paragraph (4) of the BPA stated,

> This BPA does not obligate any funds. Funds will be obligated by placement of calls under Federal Acquisition Regulation Subpart 8.4 entitled "Federal Supply Schedules", or the use of a Government wide purchase card issued under the Federal Acquisition Regulation 13.303 entitled "Blanket Purchase Agreements", and agency regulations.

(*Id.*)

15. Paragraph (11) of the BPA stated,

> "Best Value: The Fleet Logistics Center Norfolk, Contracting Office, and OSC Solutions, enter into this blanket purchase agreement with the intent of ensuring the best value is achieved for the Navy when acquiring required materials and services as detailed in the PWS."

(*Id.* at 6)

16. Both the solicitation and the BPA referenced Federal Acquisition Regulation (FAR) 8.405-3, Blanket Purchase Agreements, and FAR 13.03, Blanket Purchase Agreements, and both consistently characterized the arrangement between the parties as a "BPA" (R4, tabs 7 at 541, 2 at 5).

---

[5] Open market items are items not on the Federal Supply Schedules or GSA schedules (FAR 8.402(f)).

17.  FAR 16.506(d)(1) instructs the government to insert FAR clause 52.216-21, Requirements, in solicitations and contracts where a requirements contract is contemplated.  Neither the solicitation nor the BPA referred to the arrangement between the parties as a "requirements contract" or referenced FAR Part 16.503 or FAR clause 52.216-21. (*see generally* R4, tabs 2 and 7)

18.  We find the agreement between the parties to be a BPA, not a requirements contract.

*OSC's Requests for Compensation for Store Labor Services:*

19.  After award of the BPA, OSC staffed the shop stores and filled an unidentified number of orders placed by the Navy under the BPA for products on OSC's GSA Schedule.  The dollar value of orders placed on OSC's BPA was less than the government estimate (answer ¶ 23).

20.  On December 31, 2020, the government exercised Option Period I, which extended the BPA to January 1, 2022 (R4, tab 5 at 112-13).

21.  In July 2021, OSC submitted an invoice requesting payment of $1,013,729.28 for "unabsorbed store services direct costs."  OSC stated that it had discounted its store service costs based on the estimated volume of sales indicated in the BPA, which had not been realized.  (R4, tab 12 at 619)  In October 2021, OSC requested a "resolution" of the unpaid invoice indicating that it desired to cancel its obligation under the BPA effective October 29, 2021, if the government would not pay the invoice (R4, tab 13 at 627).[6]

22.  On November 19, 2021, the Navy indicated its intent not to exercise the next option period (R4, tab 12 at 622-23).  As a result, the BPA expired on December 31, 2021.  On November 29, 2021, the contracting officer stated that there was "no basis for the payment of OSC's labor service invoices" and indicated that the Navy did not intend to pay the invoices or modify the BPA "to permit such charges" (R4, tab 13 at 621).

23.  On February 17, 2022, OSC filed a certified claim seeking $1,152,858 for store labor services incurred in the performance of the BPA (*see generally* R4, tab 6).  Rather than price the service costs separately, OSC included its store service costs within the cost of its products.  OSC asserted that its service costs were not compensated because the Navy ordered "a small percentage" of the product amount estimated in the BPA, and OSC only received payment for services associated with its

---

[6] OSC incorrectly asserts that the Navy "backed out of" the BPA by declaring it "unenforceable" to avoid paying OSC (app. reply at 23).

products that were ordered. Had the BPA estimate been realized, OSC concluded that it would have been paid in full. (*Id.* at 115-18)

24. On April 18, 2022, the Navy denied OSC's certified claim (*see generally* R4, tab 1). The contracting officer concluded that the BPA did not guarantee a particular volume of sales, that the BPA did not impose a contractual obligation upon the Navy, and that OSC made a business decision not to propose separate pricing for store labor prices since that was specifically identified in the Solicitation and discussed in the exchanges prior to award. The contracting officer noted that OSC elected to include its store service costs within the price of the products stating that "there are no additional charge for services." (*Id.* at 1-2)

25. On June 2, 2022, OSC filed an appeal with the Board seeking $1,153,858[7] for labor service costs it allegedly incurred to staff the four Naval PWD locations under the BPA. The appeal was docketed as ASBCA No. 63294.

## DECISION

## I. The Parties' Contentions

OSC asserts that the BPA was a contract because it was an "order" which obligated OSC to provide staffing and, therefore, obligated funds to pay for staffing (app. br. at 11). OSC contends that it processed 100% of the estimated orders[8] which included "prohibited orders" for other vendors' products but was only paid store labor service costs for the portion of the orders (approximately 17%) that were for OSC products (*id.*). OSC concludes that "only products on OSC's authorized GSA pricelist could be ordered" and characterizes government purchases through other vendors as "prohibited open market purchases" (*id.* at 1, 5). In effect, OSC posits the BPA as a requirements contract[9] conferring exclusive rights upon OSC to fulfill all orders under the BPA with OSC's products thereby earning store labor service costs for every order placed (*id.* at 11). Alternatively, OSC asserts that the Navy should be required to pay for OSC's services under an implied in fact or constructive change theory since the Navy "cannot get free services by ordering prohibited goods outside the terms and conditions of the Order" (*id.* at 12).

---

[7] The amount sought in OSC's complaint for $1,153,858 differs by $1,000 from the amount stated in OSC's claim in the amount of $1,152,858. In its reply brief, OSC clarified that the claim amount of $1,152,858 is the correct amount sought.

[8] The inference that OSC processed orders for other vendors' products differs from its claim that the "estimated volume of orders did not materialize" (R4, tab 6 at 115). There is no evidence in the record that OSC filled orders for other vendors' products.

[9] While it does not use this term, OSC treats the BPA as if it were a requirements contract under FAR 16.503.

7

The Navy asserts that the BPA was <u>not</u> a contract as it did not obligate any funds and did not bind the government to order the estimated quantity. The Navy notes that OSC was invited both through the solicitation and during discussions to submit labor pricing, and OSC responded that its service costs were included in the price of the products and therefore "no additional charge" (gov't br. at 9-10). The Navy contends that OSC made a "deliberate business decision in pricing its proposal" and is not entitled to relief under any legal theory (*id.* at 14). Finally, the Navy asserts that it did not enter into a requirements contract with OSC (gov't reply at 4-5).

## II. Standard of Review under Board Rule 11

Under Board Rule 11, the parties may waive a hearing and instead have the Board issue a decision based on the record. "Unlike a motion for summary judgment, which must be adjudicated on the basis of a set of undisputed facts, pursuant to Board Rule 11, the Board 'may make findings of fact on disputed facts.'" *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (citing *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,886 n.13).

## III. OSC cannot prevail under an express contract theory.

### A. The dispute arises under the BPA, not the Schedule Contract.

First, we must address where the dispute arises. The Court of Appeals for the Federal Circuit established a "bright-line rule" in its decision in *Sharp Electronics v. McHugh* that "all disputes requiring interpretation of the schedule contract go to the schedule [contracting officer], even if those disputes also require interpretation of the order, or involve issues of performance under the order." 707 F.3d 1367, 1373 (Fed. Cir. 2013). However, the Court explained the application of this rule does not prevent the contracting officer from construing the language of the order or to apply relevant provisions of the schedule contract as long as there is no dispute in their meaning. The Federal Circuit held:

> FAR 8.406-6 does not authorize an ordering CO to decide a dispute requiring interpretation of schedule contract provisions, in whole or in part, regardless of whether the parties frame the dispute as pertaining to performance. However, the ordering CO is certainly authorized to construe the language of the order (or its modifications). Because an order's details—not merely price, quantity, and specifications, but also permissible variation in quality or quantity, hours and location of delivery, discounts from schedule pricing, etc.—are arranged between the schedule

8

contractor and the ordering CO, the ordering CO is able to construe these commonly disputed terms as long as the dispute does not involve interpretation of the schedule contract.

(*Id.* at 1374)

Pursuant to the bright-line rule from *Sharp Electronics*, we must determine whether this dispute requires interpretation of schedule contract provisions, in whole or in part. *Id.*

In this case, the dispute does not require interpretation of or a dispute regarding schedule contract provisions. Instead, OSC's claim focuses on the BPA and its asserted rights under the BPA. The Navy focuses on how OSC bid the BPA and asserts that the schedule contract has no relevance to this appeal (gov't reply at 5). We agree.

### B. This BPA is not a contract.

While OSC attempts to bind the government to exclusively purchase OSC products, this BPA is not a requirements contract, or even a contract at all. There are fundamental differences between a requirements contract and a BPA. A requirements contract is a binding contract; a BPA generally is not. A requirements contract "creates a binding contractual obligation upon the government to order, and for the contractor to furnish the government's needs or requirements of a specific item or service for a specified period of time." *Gen. Dynamics Ordnance and Tactical Sys., Inc.*, ASBCA No. 56870, 11-2 BCA ¶ 34,774 at 171,128 (citing *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992)); *see also* FAR 16.503. "[A]n essential element of a requirements contract is the promise by the buyer to purchase the subject matter of the contract exclusively from the seller." *Modern Sys. Tech Corp. v. United States*, 979 F.2d 200, 205 (Fed. Cir. 1992). "[I]t is the very essence of a requirements contract . . . that the buyer agree to turn to the supplier for *all* of its needs." *Id.* at 206 (quoting *Torncello v. United States*, 681 F.2d 756 (Cl. Ct. 1982)).

Conversely, a BPA that does not impose a binding obligation upon the parties is not a contract. *Crewzers Fire Crew Transp. Inc. v. United States*, 741 F.3d 1380, 1384 (Fed. Cir. 2014); *Modern Sys. Tech Corp.*, 979 F.2d at 202-04. The Court of Appeals for the Federal Circuit and the Board have consistently held that a BPA was not a contract where it lacked mutuality of consideration and found that separate contracts "come into being each time the Government ordered services [under the BPA] and appellant provided such services." *Hewlett-Packard Co.*, ASBCA Nos. 57940, 57941, 13-1 BCA ¶ 35,366 at 173,551 (quoting *Julian Freeman,* ASBCA No. 46675, 94-3 BCA ¶ 27,280 at 135,906); *see also Dr. Chauncey L. Duren d/b/a Chesapeake Orthopedics*, ASBCA No. 35773, 90-1 BCA ¶ 22,386 at 112,487. Once an order is

9

placed under a BPA, a contract is created with respect to that order, but the BPA is not a contract where it lacks mutuality of consideration. *See*, *Hewlett-Packard Co.,* 13-1 BCA ¶ 35,366 at 173,551 (discussing *Zhengxing v. United States*, 204 F.App'x 885, 886-87 (Fed. Cir. 2006), *aff'g*, 71 Fed. Cl. 732 (2006)).

A contract with the government requires (1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the government's representative to bind the government in contract. *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003). A failure of any of these requirements precludes the existence of a valid contract.

Here, the BPA is not a contract because it lacks mutuality of consideration. The BPA expressly stated that it did not obligate any funds or guarantee a specific volume of purchases (findings 13-14). While the BPA may have required OSC to perform some staffing services in preparation for issuing orders under the BPA, we hold that there is no consideration under the BPA for such work. OSC was solicited to provide service costs for staffing the four locations; however, OSC declined to do so in its proposal and exchanges prior to execution of the BPA (findings 8-10). Instead, OSC consistently indicated that its service costs were incidental to the purchase of products which would be sold under orders issued against the BPA and captured within the purchase price of the products sold (*id.*). At the time the BPA was executed, neither party intended any compensation for services until such time as an order might be issued. Lacking mutuality of consideration, we conclude that the BPA is not a contract. Because the BPA is not a contract, it does not serve as a basis for Board jurisdiction or afford OSC any remedy.[10]

## IV. OSC cannot prevail under an implied contract theory.

OSC asserts that an implied contract arose from the BPA whereby OSC would perform services to stock and staff the four locations and would be paid "the fair and reasonable value" of work performed (compl. at 2).

### A. OSC cannot prevail on its implied-in-fact contract argument.

An implied-in-fact contract is founded upon a meeting of the minds and "is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Guardian Safety & Supply LLC dba Enviro Safety Products*, ASBCA No. 61932, 19-1 BCA ¶ 37,333 at 181,560; *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012) (quoting *Hanlin v.*

---

[10] As indicated in the Board's decision on the government's motion to dismiss, we concluded that OSC's assertion of an implied-in-fact contract was sufficient to establish jurisdiction over the dispute.

*United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003)); *see also Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1297 (Fed. Cir. 1986) ("A contract implied in fact is not created or evidenced by explicit agreement of the parties, but is inferred as a matter of reason or justice from the acts or conduct of the parties."). The requirements for an implied-in-fact contract with the government "are the same as for an express contract; only the nature of the evidence differs." *Hanlin*, 316 F.3d at 1328; *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). The elements of proof to establish a valid contract with the government are: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) actual authority on the part of the government representative to bind the government in contract. *Anderson*, 344 F.3d at 1353. OSC bears the burden of proving the existence of an implied-in-fact contract. *Altanmia Com. Mktg. Co.*, ASBCA No. 55393, 09-1 BCA ¶ 34,095 at 168,584.

For the same reasons that the BPA is not an express contract, it also is not an implied-in-fact contract. The BPA did <u>not</u> obligate government funds (findings 5, 14). This demonstrates both a lack of government intent to contract as well as a lack of consideration. OSC proposed that it would perform services "for no additional charge" stating that service costs were "incidental to the purchasing of the products" (finding 10; *see also* findings 8-9). The repeated and express nature of OSC's communications regarding this element of its price proposal demonstrates OSC's intent to capture its service costs through orders, not the BPA. The meeting of the minds as expressed in OSC's proposal, exchange communications, and the BPA was that OSC would be compensated for service costs through product orders, not through the BPA. The BPA lacks consideration.

The compensation now sought by OSC for store labor services arises from how OSC bid the BPA, specifically its decision to not separately price service costs. While OSC attempts to explain the logic and intent behind its decision to bid the BPA in the manner that it did, it has not alleged or demonstrated grounds to recover for a mistake in its bid. Rather, OSC made a deliberate business decision to not separately price service costs. Further, OSC's allegations regarding the source selection process for the BPA and the exclusion of another offeror are irrelevant and unsupported. OSC has presented no evidence to substantiate its assertions. Attorney argument is not evidence. *Icon Health and Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017); *see, e.g.*, *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("[U]nsworn attorney argument . . . is not evidence and cannot rebut . . . other admitted evidence . . . .").

We will not disregard the express language of OSC's proposal or its communications regarding its price proposal prior to award of the BPA which clearly listed $0.00 for services, stated that the services were incidental to the purchase of products and were included "for no additional charge" (findings 8, 10). We find no

basis for an implied-in-fact contract that would be contrary to the terms of both OSC's proposal and the BPA. OSC has not met its burden to demonstrate an implied-in-fact contract.

### B. OSC cannot prevail on a quantum meruit argument.

A common theme among OSC's arguments is the unfairness of the government's refusal to pay the claimed service costs which appears to be a *quantum meruit* argument. Recovery in *quantum meruit*, or quasi-contract, is generally considered to involve a contract implied-in-law rather than a contract implied-in-fact. *R.G.W. Commc'n Inc.*, ASBCA Nos. 54495, 54557, 05-1 BCA ¶ 32,972 at 163,333; *Perri v. United States*, 340 F.3d 1337, 1343 (Fed. Cir. 2003); *see also Trauma Service Grp. v. United States*, 104 F.3d at 1327 (receipt of services benefiting the government does not create an implied-in-fact contract to pay for them but involves a contract implied-in-law scenario). Generally, the Board lacks jurisdiction to grant relief arising from an implied-in-law contract. *R.G.W. Communications Inc.*, 05-1 BCA ¶ 32,972 at 163,333; *United Pacific Ins. Co.*, ASBCA No. 53051, 03-2 BCA ¶ 32,267 at 159,623, *aff'd, United Pacific Ins. Co. v. Roche*, 380 F.3d 1352 (Fed. Cir. 2004). To the extent that OSC seeks equitable relief under an implied-in-law contract or *quantum meruit* theory of recovery, OSC's claim is denied because the Board lacks jurisdiction to grant such relief.

## V. OSC has failed to demonstrate a constructive change.

OSC argues that government orders for other vendors' products constituted changes for which OSC should be compensated (app. br. at 12). "A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." *Int'l Data Prods. Corps. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) (citing *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994)). "If a contractor performs work that cannot be characterized as additional work under the contract, it does not constitute a change." *South Bay Boiler Repair, Inc.*, ASBCA No. 59281, 17-1 BCA ¶ 36,634 at 178,426 (citing *Int'l Data*, 492 F.3d at 1325); *see also Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014) ("To demonstrate a constructive change, a plaintiff must show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government.").

To recover based on a "change" theory, a contractor must show that the extra work allegedly performed was not "volunteered," but a result of direction from a Government official. *See, e.g.*, *Len Co. & Assoc. v. United States*, 181 Ct. Cl. 29, 38 (1967); *Inman & Assoc. Inc.*, ASBCA No. 37869 *et al.* 91-3 BCA ¶ 24,048 at 120,370.

Here, OSC's "change" argument is underdeveloped and unsupported. While OSC alleges that it incurred service costs operating the shop stores, there is no apparent change or extra work required from OSC. OSC committed to staff the shop stores in exchange for service costs earned through the sale of its products. OSC offers no evidence, only counsel argument, of any extra work performed. "Attorney argument is not evidence." *Icon Health and Fitness, Inc.*, 849 F.3d at 1043.

As previously discussed, the BPA did not create a requirements contract whereby OSC would be the exclusive provider to the Navy for the MRO products at issue (finding 18). Additionally, the solicitation notified OSC that it might be required to assist the government in finding sources of supply for items not on OSC's GSA Schedule and that MRO products not "initially identified in the Schedule provided may be added at any time based on the requirements of the ordering activity and must be added to the GSA Schedule" (findings 2-3). The PWS also indicated that the government could submit purchase requests for brand-name or manufacturer-specific items and OSC's proposed substitution of OSC Schedule products may be denied (finding 3). Thus, we find that OSC was on notice, before it submitted its proposal, that it might be required to add products to its GSA Schedule (findings 2-3). We find no evidence of extra work. OSC has failed to demonstrate a constructive change.

CONCLUSION

For the reasons stated herein, the appeal is denied.

Dated: July 20, 2023

LAURA J. ARNETT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

13

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63294, Appeal of OSC Solutions, Inc., rendered in conformance with the Board's Charter.

Dated:  July 24, 2023

_for Tammye D. Abbott_

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals